Ronald E. DUNN, Respondent,

v.

ST. LOUIS–SAN FRANCISCO RAIL-
WAY COMPANY, Appellant.

No. 62428.

Supreme Court of Missouri,
En Banc.

June 8, 1981.

Rehearing Denied July 14, 1981.

Burlington Northern Railroad, Inc. Law Department, St. Louis, Gerald D. Morris, St. Louis, for appellant.

C. Marshall Friedman, Newton G. McCoy, Friedman, Weitzman & Friedman, P. C., St. Louis, for respondent.

WELBORN, Special Judge.

Action for damages, under Federal Employers' Liability Act (F.E.L.A.), 45 U.S.C. § 51 et seq., for injuries sustained by Ronald E. Dunn while working as an apprentice carman for defendant, St. Louis-San Francisco Railway Company (Frisco). Jury returned verdict for plaintiff for $275,000 damages. The Missouri Court of Appeals, Eastern District, reversed the judgment and remanded for a new trial. Dissenting judges in that court certified the case to this Court. Rule 83.01.

Plaintiff was employed by defendant in Fort Smith, Arkansas as an apprentice carman and had completed one and one-half years of a four-year apprenticeship. A carman rebuilds and repairs boxcars, tankcars and flatcars. In the course of his job, a carman repairs wheels, gears, brakes and removes the wooden lining from the interiors of boxcars.

Boxcars are lined with tongue and groove boards or plywood sheets, nailed to stringers in the ends of the boxcars. A stringer is a four by four wooden board, sometimes oak and more frequently a softer wood, pine or fir. Its length is equal to the width of a boxcar. Stringers are bolted horizontally to the steel exteriors of the boxcars.

In Frisco's operation, the boxcar lining is removed, or "pulled", on K-1 track at its facility in Fort Smith. As cars from various railroads enter the train yard, an inspector routes them to designated tracks for appropriate repairs. The lead carman marks lining to be pulled from the cars assigned to K-1 track.

At the time of plaintiff's injury, a carman was given two tools to pull lining, a crowbar and a five to six foot long lining car, weighing twenty-five pounds and having a foot at one end. These tools ordinarily performed adequately to pinch, pry or pull. However, removal of the lining of cars for the Atchison, Topeka & Santa Fe Railroad often presented a problem. The end lining of the Santa Fe cars was built of two plywood sheets one inch thick, four feet wide and ten feet long, with thirteen inch strips between, and was attached with a

large number of heavy screwnails. Often, two men working together could not remove the lining from Sante Fe cars. Lining bars had been bent in the removal process. The employees had complained for years about the problems and hazards of removing this type of lining. The carmen complained at their periodic safety meetings of the inadequacy of the tools furnished, but no other tools were provided by Frisco for Santa Fe cars. The employees had to "strain their guts" to pull this lining off, using their back, legs and arms. Sometimes the carmen would ask a laborer to run the forklift to assist in the pulling of lining. A clamp and chain were attached to the plywood lining and the power of the hydraulic system of the forklift pulled it. However, the forklift was not always available, and the carmen's supervisors discouraged its use. Defendant's evidence was that some supervisors considered the use of a forklift for this purpose dangerous.

On the date of his injury, Wednesday, October 23, 1974, plaintiff had removed the lining from four boxcars before he and journeyman carman Gary Marshall began work on a Santa Fe car. When he realized it was the heavy lining, plaintiff asked his supervisor, lead carman Leo Moss, for a forklift. However, Moss told him to use the lining bar. Plaintiff inserted his lining bar three feet from the floor, placed one foot on the floor and the other foot on the end wall, in a crouched position, and pulled. He then felt a sharp, shooting pain in his lower back. He tried to stand up, but was unable to rise to a straight, upright position. He told Gary he was hurt, rested ten minutes, then returned to pulling the lining. Thinking the pain would abate, he worked Thursday and Friday on a different assignment, checking and adjusting air brakes on the cars. Plaintiff did not report the injury to his supervisors or seek medical assistance on the job because he feared reprisal for reporting an on-the-job injury. There was evidence other employees, including supervisors, knew that he had been injured. After bedrest during the weekend, plaintiff reported for work on Monday. He could not work due to pain, was hospitalized, and

eventually a ruptured disc was repaired surgically.

Appellant's first assignment of error is based upon the trial court's overruling of objections to deposition testimony of plaintiff's witness, Jerry Daniels, to the effect that appellant needlessly removed good lining from boxcars and replaced it with poor lining. Appellant contends that such evidence was beyond the scope of the pleadings, immaterial and irrelevant, and " * * * caused defendant to be place in a bad light, in short, appear crooked, in the eyes of the jury on a false issue which was neither pleaded nor relevant to the case." (This was the assignment of error which was the basis for the reversal by a divided court of appeals.)

In his opening statement to the jury, counsel for plaintiff stated that Frisco removed and replaced linings on boxcars for other railroads for which "billings were substantial." When plaintiff's counsel stated that on numerous occasions lining was unnecessarily removed, defense counsel objected that the decision as to what lining should be pulled was not an issue. Defense counsel responded, out of the hearing of the jury, that unnecessary work was done because Frisco wanted to increase their billing to other railroads and that plaintiff was injured while engaging in such work. Defense counsel restated his position that the decision as to what lining should be pulled was not related to any issue of negligence. The trial court overruled the objection " * * * at this time, * * * subject to specific objections in the course of the evidence."

Plaintiff's counsel then continued his opening statement, reiterating that lining was removed unnecessarily and stating, without further objection, that lining was replaced with "material * * * not as good as the materials they tore out and they only tore it out for billing purposes, to bill other railroads to increase the billing for the Frisco."

In his opening statement, counsel for defendant stated that Whirlpool, a shipper at Fort Smith, required boxcars to be in good

shape on the inside for their products and Frisco had to put cars in shape so that Whirlpool would accept them, and it was necessary for Frisco to remove "rotten feed or something like that behind the plywood (lining) * * *." Counsel also stated that " * * * when the cars are upgraded, it's correct, billing was done."

Plaintiff's case opened with the reading of a deposition of Gary Lee Marshall, a Frisco carman. When the questioning on the deposition came to the subject of billing by Frisco of other railroads for replacement of boxcar lining at the Fort Smith yards, an objection by defense counsel to such testimony was sustained. Marshall who was working with plaintiff at the time of his injury testified to the circumstances of that occurrence. His testimony included the statement: "The lining in these cars are (sic) pulled for several reasons. They are either broken, decayed, or feed and debris behind the lining. And in order to raise the car from one class to another for higher class loading, this work has to be done. And that's the reason for pulling this lining."

Plaintiff then read the deposition testimony of Daniels, also a carman employed by Frisco at Fort Smith. Objection to his deposition testimony regarding Frisco's billing other roads for pulling linings was sustained. Also excluded was an early question and answer in which the witness expressed the opinion that Frisco would pull lining on foreign cars that was in better condition than that with which it was replaced.

Daniels did testify about the problems encountered in removing plywood lining from Santa Fe cars and possible alternative methods, involving the use of machinery, which had been suggested by carmen to their supervisors, on such work.

After direct, cross, redirect, recross, redirect, recross, redirect and recross-examination, the examination returned to redirect examination and got into billing by Frisco on lining pulled from foreign cars which the witness did not think needed to be replaced. Defense counsel's objection was that the examination " * * * touches the subject * * that this carman did not think that the work done was necessary to be done in some instances and that the work was done to build up billing by the Frisco against other railroads * * * [T]his is not an issue in this case, does not touch the issue of negligence * * * and is not material or relevant to the issue of railroad negligence * * *."

The court sustained the objections to the reading of the redirect and plaintiff's counsel then stated that he wished to read the recross. Defense counsel again objected, stating that his objection was the same as that made to the redirect. He reiterated that the matters involved were "not an issue * * * pertaining to negligence." When the trial court indicated that it would permit reading of portions of the recross, defense counsel stated: "Can it be stipulated that my general objection as to whether or not this is an issue of negligence goes to all these questions which the Court permitted to be read?"

Plaintiff's counsel then read the following from the recross-examination:

"Q Are you saying that the supervisors requested or told you fellows to do work that did not need to be done?

"A Yes.

"Q What have you seen? Now, be very specific about what you have seen.

"A I've seen new end lining taken out and a poor grade put in.

"Q Who would have written up that end lining?

"A The lead man.

"Q Has Mr. Moss retired?

"A He has retired.

"Q Is it your recollection that this was done while he was still the lead man?

"A Yes.

"Q So you have taken out linings that did not appear to you to have anything wrong with them, is that correct?

"A Correct.

"Q And you replaced that lining that you took out with other lining, is that right?

"A  Yes.

"Q  Now, what about the lining that you put in?  I believe your testimony a while ago indicated that it might not be as good as the lining that you took out; is that right?

"A  In my opinion.

"Q  What was your opinion based on?

"A  Just appearance.

"Q  Was it old?  I mean—was it scarred up?

"A  No.

"Q  Different thickness or what?

"A  Green, sap ridden, warped; it might have gaps between it after it hung.

"Q  Okay, now, I would like to know—in your best estimate—how many times you have done that; you now, that stuck out to you where the work really didn't need to be done?

"A  I couldn't say in numbers, but when we were doing the job heavy, back at the time of the accident, often.

"Q  Every day?

"A  Every day.

"Q  Did you ever pull out some of this lining that we've been talking about here, this tough lining, that didn't need to be pulled out?

"A  (No response.)

"Q  Were you ever ordered to write up that kind of lining for your report?

"A  Yes.

"Q  When you pulled out some of this inch plywood lining, what did you usually replace it with?

"A  Three-quarter inch, one by three and a quarter lumber.

"Q  You mean narrow boards?

"A  Narrow tongue and groove.

"Q  New?

"A  Yes.

"Q  Going back to another matter for just a minute.  Was the lining any harder to pull, that didn't need to be pulled, in your opinion, as that that did need to be pulled?

"A  You're referring to the one-inch plywood?

"Q  Yes.

"A  The same."

(Questions and answers in the recross relating to billing were excluded by the court.)

It is the above quoted series of questions and answers which forms the basis for appellant's complaint.

■ This perhaps too great detail of what had occurred prior to and at the time of the reception of the objected to testimony is meant to show the basis of appellant's objection in the trial court, i. e., that the evidence did not relate to the negligence pleaded and was irrelevant and immaterial. At no point did defense counsel suggest to the trial court that the effect of the evidence would be to make the defendant appear dishonest.  The failure to voice such objection does not preclude the defendant from asserting on appeal that such was the prejudice which the irrelevant or immaterial evidence produced when the evidence is "obviously prejudicial in character." *Hungate v. Hudson*, 353 Mo. 944, 185 S.W.2d 646, 648–649[1–5] (1945).

■ Testimony that lining was unnecessarily removed did have some conceivable relevance to the pleaded negligence of failure to provide safe working conditions, safe methods of work and reasonably safe equipment and work tools, given plaintiff's evidence of the difficulties encountered in the removal of Santa Fe car linings with the tools provided and methods followed.  Unnecessary exposure to such difficulties would increase the risk of injury and thereby bear upon the negligence charged. Plaintiff's testimony was that he saw nothing wrong with the lining which he was pulling at the time of his injury, admitting of the inference that it was being pulled unnecessarily.

However, the relevancy of the replacement material to the negligence charged cannot be defended.  The question is whether or not that testimony obviously made appellant appear crooked and dishonest.  Appellant's motion for new trial points out that some further inference is required for that testimony to have such obvious

effect. The assignment in the motion for new trial is that the trial court erred in permitting the reading of Daniels' testimony to the effect that defendant unnecessarily removed linings "and inferring that defendant engaged in such a practice for the purpose of increasing its billing to other railway companies for repairs. Said evidence was not relevant to any issue of defendant's negligence * * *."

As above pointed out, prior to the ruling on the testimony now in question, the trial court had sustained objections to questions relating to Frisco's billing practices, so there was no evidentiary basis for the charge of an inference that the work was unnecessarily done in order to increase billings. The testimony which might have provided the basis for an inference of a dishonest motive in using inferior replacement lining having been excluded, the evidence complained of was not "obviously prejudicial."

Furthermore, for the testimony to be given the effect which appellant would assign it, the further inference must be drawn that the witness was referring in his testimony to "foreign" cars. To remove good lining from its own cars and replace it with inferior would be a poor business practice but not necessarily dishonest. Note the witness's failure in this exchange to respond to the direct question: "Did you ever pull out some of this lining that we've been talking about, this tough lining, that didn't need to be pulled out?"

■ The caliber of the replacement materials was the subject of only the single brief reference above quoted. It did not become a diversionary issue. Although irrelevant and immaterial, the admission of that testimony may provide the basis for reversible error only if it had a material effect upon the merits of the case. Rule 84.13(b). No such effect can be accorded that testimony.

Appellant attempts to buttress its claim of error in the admission of the testimony by a question and answer in the cross-examination of defendant's witness Dale, a Santa Fe General Car Inspector:

"Q * * * You would be quite upset if they (Santa Fe) knew that good lining was being torn out of their cars and they were being billed for them?

"A Yes, sir.

"Q It's just not kosher, is it?

"A No, sir."

■ Although defense counsel had vigorously and successfully objected to questions and testimony designed to show that Frisco engaged in the practice of tearing out lining just for billing purposes, no objection was voiced to the questions asked Mr. Dale. This unobjected to exchange may not be relied upon as a basis for a finding of error on the part of the trial court in overruling the objection to the earlier testimony. With few exceptions, only matters which are brought to the trial court's attention and upon which a ruling of that court is at least sought provide the basis for a finding of error on the part of the court. No complaint was made at the trial that Dale's testimony served to supply the prejudicial effect of the testimony previously admitted. Had the matter been presented, the trial court could, had it agreed, have taken remedial action as it did in other situations when the billing question arose. Upon the objections which were made in the trial court, that court did not err.

Defense counsel would excuse his failure to object to the questions to Dale on the grounds that objection "would have been futile because the issue was before the jury through Daniels' testimony." However, Daniels' testimony had not placed the billing issue before the jury. When plaintiff testified earlier that lining was removed "to get billing," defense counsel's motion to strike the testimony was sustained. In view of the trial court's consistent rulings on the billing issue when objection was raised, the absence of objection to the question posed to Dale may not be excused.

Defendant's second contention is that the trial court erred in admitting Dr. Thomas Banton's testimony concerning the manner in which plaintiff's claimed injury occurred and the details of plaintiff's past complaints

because Doctor Banton first saw plaintiff 15 months after the claimed injury and his testimony is inadmissible hearsay. Doctor Banton testified that he examined plaintiff at counsel's request more than one year after the injury. He stated over objection that the history obtained from plaintiff was that he was pulling heavy items from a boxcar when he experienced low back pain. In response to a hypothetical question Doctor Banton testified that, based on reasonable medical certainty, plaintiff's medical problems were caused by the injury received on October 23, 1974, in pulling end lining.

■ There is no need to decide whether Doctor Banton's challenged testimony is hearsay or not because admission of the evidence, even if inadmissible, could not result in reversible error. The admission of evidence claimed to be hearsay is reversible error only if the complaining party is prejudiced. *McDowell v. Southwestern Bell Telephone Co.*, 546 S.W.2d 160, 161–162[1] (Mo. App.1976); *Fallert Tool & Engineering Co., Inc. v. McClain*, 579 S.W.2d 751, 758[14–16] (Mo.App.1979). The complaining party cannot be prejudiced by the allegedly inadmissible evidence if that party offers evidence to the same effect as the challenged evidence, *McDowell*, or if the challenged evidence is merely cumulative to other admitted evidence of like tenor. *Fallert Tool & Engineering Co., Inc.; Baker v. Woodbury*, 492 S.W.2d 157, 159[2–4] (Mo.App.1973).

■ In this case, other independent evidence of the manner in which plaintiff sustained injury and plaintiff's past complaints had been introduced by both plaintiff and defendant. Plaintiff testified prior to Doctor Banton and stated that he was pulling with extreme force on the end lining when he felt low back pain that caused him to stop working. A coworker, Gary Marshall, who was assisting plaintiff in pulling the end lining, testified for plaintiff that plaintiff had stopped working, held his back, and told Marshall that he hurt his back. This evidence showed the circumstances surrounding the injury independent of Doctor Banton's testimony. Other physicians who testified for plaintiff stated plaintiff gave them the same history as related by Doctor Banton. In addition, defendant's witness, Dr. Paul Stohr, later testified to the identical facts, saying that plaintiff told the witness he injured his back pulling a large piece of plywood from the side of a boxcar.

Doctor Banton's testimony could not have prejudiced defendant and its second contention is without merit.

■ Defendant next contends the trial court erred in refusing defendant's tendered Instruction A withdrawing from the jury any consideration of a "foot drop" condition which plaintiff might develop. Defendant argues the testimony of plaintiff's doctors showed only a possibility, and not a reasonable medical certainty, that the condition would occur and that the condition was not sufficiently related to plaintiff's injury to constitute an element of damages. Dr. Thomas Banton testified that his first examination of plaintiff revealed plaintiff had a weakness of the right great toe, which indicated damage to the fifth lumbar nerve. Dr. James Brown stated there was a possibility that plaintiff might develop foot drop and that, if an examination of plaintiff showed atrophy of the right leg, it would be due to a L5 nerve injury. Doctor Banton testified to the discovery of atrophy in plaintiff's right quadricep. Giving or refusing a withdrawal instruction is a matter directed to the discretion of the trial court, which discretion should be guided by the degree to which evidence has been introduced which might mislead the jury in its consideration of the case as it is pleaded. *Sampson v. Missouri Pacific R. R. Co.*, 560 S.W.2d 573, 584[9] (Mo. banc 1978). The doctors' testimony was not so extensive or inflammatory as to mislead the jury. The aggregate of the doctors' testimony shows that plaintiff had exhibited symptoms of atrophy and weakness which would support the theory of a foot drop condition. Therefore, the court did not abuse its discretion in refusing Instruction A.

Defendant's fourth contention is that the trial court erred in refusing defendant's

tendered non-MAI Instructions, B, D, and E because such instructions comported with federal law pertaining to F.E.L.A. and federal law governs in such cases.

Instruction B states:

"The term negligent or negligence as used in these instructions means that failure to use that degree of care than [sic] an ordinarily careful and prudent person would use under the same or similar circumstances.

"The defendant is not an insurer of the safety of its employees while they are on duty. The defendant is not held to absolute responsibility for reasonably safe conditions, appliances, or methods for work; defendant's duty is to exercise ordinary care commensurate with the danger reasonably to be anticipated.

"The happening of an injury to plaintiff, standing alone, does not make defendant liable and it does not raise a presumption of negligence on the part of defendant.

"The duty of defendant is measured by what is reasonably foreseeable under the circumstances."

■ The first paragraph of Instruction B sets forth a definition of negligence which is approved by MAI 11.02 and which was given by the trial court below in Instruction 3. However, the second, third and fourth paragraphs of Instruction B are inconsistent with MAI and would be properly refused under MAI because the paragraphs are abstract statements of law requiring no finding by the jury, *Anderson v. Sellers*, 521 S.W.2d 33, 37[2] (Mo.App.1975), and the paragraphs incorrectly instruct the jury upon what the issues are not, rather than upon what the issues are. *Wise v. Coleman*, 360 Mo. 829, 230 S.W.2d 870, 872[1, 2] (1950).

■ Any modification of an approved MAI instruction must be simple and brief, Rule 70.01(e), and shall not confuse and mislead the jury. *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 716[6, 7] (Mo.App.1974). Instruction B does not conform to such standard.

Instruction D reads:

"Your verdict must be for defendant if you believe that the work plaintiff was performing was difficult but that defendant was not negligent.

"Defendant was not required to furnish plaintiff with the latest, best, or most perfect appliances with which to work, nor to discard standard appliances and tools already in use provided those tools and appliances in use were safe and suitable. You may not find defendant liable merely because there may be a safer or easier method of performing the work in question."

■ Instruction D purports to converse the verdict director given in this case, Instruction 4, modeled upon MAI 24.01. Instruction D, however, is not in substantially the same language as that used in Instruction 4 and was, therefore, properly refused under MAI. *Griffith v. St. Louis-San Francisco Ry. Co.*, 559 S.W.2d 278, 281[2] (Mo. App.1977), cert. denied, 436 U.S. 926, 98 S.Ct. 2821, 56 L.Ed.2d 769 (1978).

Instruction E states:

"If you find in favor of plaintiff and decide to make an award for any loss of earnings in the future, you must take into account the fact that the money awarded by you is being received all at one time instead of over a period of time extending into the future and that plaintiff will have the use of this money in a lump sum. You must therefore determine the present value or present worth of the money which you award for such future loss."

■ Instruction 7, a damages instruction authorized by MAI 4.01, was given in this case. Any further explanation of the MAI damages instruction by the tendered Instruction E is not acceptable procedure under MAI. *McBee v. Schlupbach*, 529 S.W.2d 435, 439[2] (Mo.App.1975); *Jurgeson v. Romine*, 442 S.W.2d 176, 177[1–3] (Mo. App.1969).

■ Thus, defendant's proffered Instructions B, D, and E were properly refused under MAI. Further, the circumstances

or the guidelines set forth in *Rogers v. Thompson*, 308 S.W.2d 688, 692[2] (Mo. 1958), would not indicate that the trial court's action interfered with federal rights. There is no compelling reason to limit application of the general rule that the form of instructions and manner in which the substantive law is submitted to the jury in an F.E.L.A. case are procedural matters governed by state law. *Rogers*; 79 A.L.R.2d 553, 572–573 (1961).

Defendant's fifth contention is that the trial court erred in refusing defendant's proffered Instruction C, which reads:

"If your verdict is in favor of plaintiff, your award will not be subject to any income taxes and you should not consider such taxes in fixing the amount of your award."

Since the trial of this case, the United States Supreme Court decided *Norfolk and Western Railway Company v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62, L.Ed.2d 689 (1980). The Court held that a defendant in an F.E.L.A. case was entitled, as a matter of federal law, to an instruction substantially identical to that tendered by the defendant here, whether the case is tried in state or federal court. The problem presented by the assignment of error here is whether or not *Liepelt* is to be given retroactive effect so as to make the refusal of such an instruction error in a case tried before *Liepelt* was decided.

This question was before the Eastern District of the Missouri Court of Appeals in *Ingle v. Illinois Central Gulf R. Co.*, 608 S.W.2d 76 (Mo.App.1980). In that case, the court applied the test of retroactivity laid down in *Chevron Oil Co. v. Hudson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), and concluded that *Liepelt* should not be applied to make the refusal of such an instruction error in a case tried before *Liepelt* and decided, on appeal, subsequent to *Liepelt*. Application for transfer of Ingle was denied by this Court, as was application for certiorari to the United States Supreme Court (*Illinois Central Gulf R. Co. v. Richard L. Ingle*, 608 S.W.2d 76, 1981).

■ This Court accepts the reasoning and conclusion of Ingle on this issue and holds that the refusal of the instruction in this case was not reversible error.

Defendant's sixth argument on appeal is that the trial court erred in prohibiting defendant's argument to the jury that any award for loss of future earnings should be reduced to present value and would not be diminished by any income tax.

■ Instructions upon the law of the case are the prerogative of the court, not of counsel. Counsel's argument is improper insofar as it undertakes to instruct the jury upon the law in addition to instructions given by the court. *Doyle v. St. Louis-San Francisco Ry. Co.*, 571 S.W.2d 717, 725[15] (Mo.App.1978). Arguments concerning future disposition of any jury award in a negligence action are improper. See *Price v. Bangert Bros. Road Builders, Inc.*, 490 S.W.2d 53, 57[6] (Mo.1973), (trial court properly refused counsel's argument that any award over $1,500 to an infant plaintiff would be held by the probate court until her majority). Further, the arguments proposed by defendant are devoid of evidentiary support upon the record before us and are, thus, improper. See *McCormick v. Smith*, 459 S.W.2d 272, 278[3] (Mo.1970), (mathematical formula for pain and suffering perforce improper). To the extent that *Liepelt* requires an instruction on the nontaxability of the award of damages, counsel may, of course, call to the attention of the jury the content of the court's instruction on the subject.

■ The trial court did not abuse its broad discretion to permit or limit argument of counsel. *Norfolk & Western Railway Company v. Greening*, 458 S.W.2d 268, 273[7–9] (Mo.1970); *Doyle* at 725[12–14].

Appellant attacks plaintiff's verdict-directing instruction on the grounds that it constituted a roving commission, being so vague and indefinite as to be meaningless in defining the issues to be decided by the jury. Appellant further complains that the ground of negligence submitted by the instruction was not supported by the evidence

and failed to submit the issues actually tried.

Instruction No. 4 reads as follows:

"Your verdict must be for the plaintiff if you believe:

"First, defendant failed to provide reasonably safe methods of work, and

"Second, defendant was thereby negligent, and

"Third, such negligence directly resulted in whole or part in injury to plaintiff.

"MAI–24.01, by plaintiff."

■ As appellant acknowledges, this instruction substantially followed MAI 24.01. Appellant's basic complaint is against the entire scheme of MAI as applied in F.E.L.A. cases. The reasoning behind the language employed in MAI 24.01 is explained in *Ricketts v. Kansas City Stock Yards Co. of Maine*, 484 S.W.2d 216, 221–222[3] [4, 6] (Mo.banc 1972). The submission in this case —"failed to provide reasonably safe methods of work"—defined the issue in accordance with the basic premise of MAI in submitting only ultimate issues and avoiding evidentiary detail in instructions. Plaintiff's theory was that the method of work imposed by defendant involved excessive reliance upon human strength and that the defendant rejected alternative methods which would have involved the use of mechanical devices rather than human strength. Defendant joined issue in this regard and sought to justify the method employed and to explain away the failure to employ alternative methods employing mechanical devices. The instruction did adequately submit the issue tried and the ground submitted was supported by evidence.

Appellant's final point is stated as follows:

"The Trial Court Erred in Failing to Set Aside the Verdict and Order a New Trial in This Case in That the Verdict Is So Grossly Excessive That It Is the Result of Passion and Prejudice on the Part of the Jury. If the Court Believes the Rule of Uniformity Is Applicable, Then There Should Have Been in the Trial Court and Should Be in This Court a Remittitur of $100,000.00."

Evidence favorable to the verdict showed that plaintiff was 28 years of age at the time of his injury. His injury was a herniated disc which required surgical repair. He was hospitalized for 10 days in November, 1974, and spent 30 days thereafter in bed at home, in considerable pain. In June, 1975, his physician suggested that plaintiff return to light duty with the railroad, but defendant would not employ him on that basis. He had some income from light welding at home, but was unable to continue in that field of employment because of pain which would not permit him to stay on his feet.

Plaintiff was rehospitalized in November, 1975, because he "broke down." He came under psychiatric care and the psychiatrist was of the opinion that plaintiff's breakdown arose from the situation plaintiff found himself in because of his injury and operation, the pain and the questions concerning himself and his future.

The surgeon who performed the laminectomy testified that plaintiff had had a "bad result," would not be able to perform physical labor in the future and had incurred permanent physical limitation.

An examining physician shortly before the trial found limitation of lumbosacral range of motion, severe muscular spasm and atrophy of the right quadricep muscle.

In 1977, plaintiff worked for seven months for an armored car company at a wage about one third of what he would have earned on the railroad. He was forced to give up that work because the pain in his back and legs became so bad that he could not stand it.

On the basis of what railroad employees immediately above and immediately below plaintiff in seniority earned, plaintiff had lost approximately $35,000 in wages at the time of trial.

■ The complaint that the trial court should have set aside the verdict as excessive is directed to the discretion of the trial court. The rejection of such complaint

by the trial court affords grounds for appellate relief only if the appellate court can find an abuse of discretion on the part of the trial court which may not be based merely upon the size of the verdict but must be founded upon trial error. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 614–615[20][21] (Mo.banc 1977).

■ The trial incidents relied upon by appellant here were insignificant. For example, in cross-examination of a defense witness, counsel for plaintiff asked whether or not the witness knew of a written rule of defendant which says that an injured workman cannot return to light duty. When the witness responded that he knew of no such rule, plaintiff's counsel stated: "Either (sic) do I." The trial court, without request from defense counsel, reprimanded counsel for his voluntary remark and instructed the jury to disregard the remark. Defense counsel then moved for a mistrial which was denied. This incident would not support a finding of abuse of discretion in overruling the motion for new trial on the grounds that the verdict was the result of passion and prejudice.

Appellant also points to incidents in the final argument of plaintiff's counsel. With a single exception, the trial court sustained objections of defense counsel and granted the relief requested. The single exception was a request for mistrial based upon a remark that Frisco had failed to produce testimony from other carmen.

■ Considered neither separately nor collectively do these incidents rise to the nature of those which might call for relief in this Court on the basis here asserted.

■ Appellant suggests that a remittitur should be ordered "if the court believes the rule of uniformity is applicable." This Court would so believe only in response to a properly stated point advancing such proposition. The point as stated presents nothing for appellate review.

Judgment affirmed.

BARDGETT, C. J., SEILER, WELLIVER and HIGGINS, JJ., and STOCKARD and RUDDY, Special JJ., concur.

DONNELLY, RENDLEN and MORGAN, JJ., not sitting.